Fraticelli Torres, Jueza Ponente
*1025 TEXTO COMPLETO DE LA SENTENCIA
Mediante escrito de apelación, el señor Jorge Gautier Quiñones recurre ante nosotros para solicitar que revoquemos las sentencias dictadas por el Tribunal de Primera Instancia, Sala Superior de Carolina, el 22 de junio de 2006, en las que se le condenó por la comisión del delito de asesinato en primer grado y de varias infracciones a la Ley de Armas, Ley Núm. 404 del 11 de septiembre de 2000, según enmendada.
Inconforme con las sentencias, el señor Gautier Quiñones acude ante nos oportunamente y, en síntesis, nos plantea que el tribunal sentenciador incidió:

“(1)... al ‘no conceder al apelante el beneficio de la duda razonable’;

(2)... al declararlo culpable de los cargos instruidos aunque hubo ‘total insuficiencia de la prueba para sostenerlos’;

(3)... al dar crédito a los ‘testimonios inverosímiles, acomodaticios y contradictorios entre sí de los principales testigos de cargo ’;

(4)... al ‘admitir prueba inadmisible sobre la objeción de la defensa y al no admitir prueba admisible propuesta por la defensa’;

(5)... al negarle al apelante ‘un juicio justo e imparcial y conforme al debido proceso de ley’; y

(6)... al imponer al apelante una ‘sentencia que constituye un castigo cruel e inusitado y al no considerar la edad de éste al momento de los hechos y otras circunstancias atenuantes’. ”

*1026 Luego de analizar rigurosamente los argumentos del apelante, de examinar los autos originales del foro sentenciador, la exposición narrativa estipulada de la prueba y la comparecencia del Procurador General de Puerto Rico, resolvemos confimiar las sentencias impugnadas por los fundamentos que exponemos a continuación.
Veamos los antecedentes fácticos y procesales que justifican esta determinación.
I
El señor Gautier fue acusado de varios delitos relacionados con hechos acaecidos el 17 de junio de 2005 en el Residencial San Patricio del Municipio de Loíza. En esa fecha, el joven Luis Ramos Valdés recibió dos heridas de bala que le causaron la muerte. Al apelante se le acusó de infringir el Artículo 106 del Código Penal de 2004 y los Artículos 5.04 y 5.15 de la Ley de Armas de Puerto Rico. El juicio se celebró de manera fragmentada entre el 9 de diciembre de 2005 y el 7 de abril de 2006. El fallo fue emitido por tribunal de derecho, luego de la renuncia del apelante y de la coacusada Ana Quiñones Flores al juicio por jurado.
La prueba de cargo consistió del testimonio de varios testigos, entre ellos, uno que presenció lo acontecido, y de la prueba documental, pericial y material levantada sobre la escena del crimen. En la escena se recuperaron dos casquillos de bala calibre .45, un proyectil disparado y deformado y blindaje de bala, ambos calibre .38. En el cuerpo de la víctima se halló un proyectil calibre .38 y otro calibre .45. Se estipularon las fotos y un video de la escena y varios informes oficiales del incidente, entre ellos, el Informe de Hallazgos de Escena, el Informe Médico Forense, el Certificado de Análisis de la Sección de Armas de Fuego.
El testigo ocular lo fue el señor Guillermo Ramos Rosario, tío de la víctima. Testificó que ese día, alrededor de las 8:00 de la noche, se encontraba en el balcón de su apartamento en el segundo piso del edificio número 7 del Residencial San Patricio, construyendo unas trampas para pescar cocolías. Su hermano y su madre se encontraban en el apartamento. Su sobrino estaba en los predios del residencial. Como a las 8:20 p.m. escuchó varias detonaciones y observó a la víctima corriendo desde el edificio 5 hacia el edificio número 4 del residencial. Por su posición podía ver todo el frente de los edificios 5, 3, 7 y 4. Identificó en las fotos que se le mostraron los puntos específicos a los que se refería en su declaración y a su sobrino muerto tirado frente al edificio 4 del residencial. (Exposición Narrativa de la Prueba (E.N.P.) pág. 4.)
El testigo declaró que vio a su sobrino cuando cruzó herido entre los edificios, que venía cojeando, aguantándose el costado izquierdo y recostado de la pared. Al correr por la calle que da acceso al estacionamiento, tropezó con la baranda de la rampa de impedidos y cayó. Entonces vio que Jorge, a quien identificó como el hijo de “La Cana”, y ésta, la coacusada Ana Quiñones Flores, venían corriendo detrás de su sobrino con pistolas en las manos. Jorge tenía un revólver negro en la mano y Ana traía un revólver niquelado. Cuando la víctima chocó con la baranda, los acusados le dieron alcance, se detuvieron y le apuntaron a su sobrino con las armas. Escuchó que la coacusada Ana Quiñones le ordenó a su hijo Jorge “mátalo, mátalo". (E.N.P. pág. 5.)
El testigo declaró que les dijo a los acusados que no hicieran “lo que él está pensando”. No tuvo ninguna contestación y acto seguido Jorge le hizo un disparo a su sobrino, estando éste en el suelo. Jorge le entregó el arma a su madre y huyó de la escena del crimen por la parte posterior del edificio número 4. La madre guardó el arma en su cintura y le levantó “el suéter” a la víctima, “como registrándole por la cintura”, antes de salir por detrás del edificio 5. El testigo declaró que conocía a los coacusados “desde siempre, porque han vivido en el mismo residencial San Patricio”. Describió la vestimenta de Jorge y de su madre el día del suceso. (E.N.P. pág. 5.)
El testigo le avisó a su hermano y padre de la víctima, Luis Ramos Rosario, quien se encontraba en la cocina del apartamento, que “fue a su hijo a quien le tiraron”. Bajaron hasta el lugar en el que se encontraba el sobrino herido. También llegó allí su sobrina Angélica. “Todo sucedió en cuestión de minutos". Luego llegaron los *1027 agentes y les indicaron que tenían que abandonar la escena. El testigo Guillermo Ramos, les señaló que tenía conocimiento sobre todo lo que había ocurrido y el agente de apellido Díaz le dijo que tenía que pasar por el cuartel a hacer una declaración jurada. Allí se entrevistó con un agente de apellido Davis, a quien le narró todo lo que había presenciado. Finalmente declaró que esa noche era una noche clara y que en esos días habían cambiado los focos del alumbrado del residencial, los que describió. (E.N.P. págs. 5-6.)
En el contrainterrogatorio, el señor Guillermo Ramos declaró que vio a los acusados apuntarle a su sobrino en el área de la cabeza y que Jorge estaba de frente de su sobrino, porque cayó de espaldas. No sabía a qué distancia el occiso estaba del arma, pero que pudo ser como a dos pies. Admitió a preguntas de la defensa que parte de su testimonio no aparecía en las declaraciones juradas que prestó al comienzo de la investigación y en el proceso de Regla 6. También declaró que estaba bajo tratamiento de metadona, lo que podía afectarle la memoria. Sin embargo, reiteró que.vio a los acusados “acercarse a su sobrino como a dos pies pegados al cadáver (sic)” y que “Jorge no hizo nada hasta que recibió en dos ocasiones las órdenes de su madre que le decía ‘mátalo, mátalo ’ y que antes de eso, Jorge no había hecho nada, que también era correcto que luego que Jorge disparó le entregó el revólver a la madre y salió corriendo solo en una dirección diferente a [la que siguió] la madre. ” (E.N.P. págs. 6-11.)
El testigo declaró que nunca vio a Jorge en un punto de drogas, que lo veía haciendo gestiones de estudio y trabajo. Reiteró que les dijo a los acusados “que no fueran a hacer lo que él pensaba que iban a hacer”. (E.N.P. pág. 12.) En los turnos para el “recontra”, los dos abogados de defensa insistieron en cuestionarle al testigo sobre la distinción entre estar sentado y arrodillado y sobre otras expresiones contradictorias relativas al momento en el que se acercaron al herido o cuándo llegaron los oficiales. También se suscitó una objeción y planteamiento de indefensión de la defensa por la falta de descubrimiento de dos declaraciones juradas que obraban en el expediente del Ministerio Público, asunto que retomamos más adelante.
El segundo testigo lo fue el padre de la víctima, Luis Ramos Rosario. Éste declaró que el día de los hechos estaba en la cocina de su apartamento tomando café cuando escuchó dos detonaciones; no hizo nada “hasta que su hermano lo llamó para que fuera abajo en forma desesperado (sic)”. Soltó la taza de café y llegó al balcón y “se quedó en estado de shock porque no podía creer lo que estaba pasando”. Vio a su hijo tirado en una bajadita en una rampa de impedidos. Lo vio boca arriba y a la señora “Cana” ir de retirada, “con un arma en la mano como los hombres”. La vio con dos armas de fuego, una en el costado derecho y otra en la mano. Describió la vestimenta de la acusada el día del suceso. (E.N.P. págs. 15-16.)
El padre de la víctima declaró, además, que esperó hasta que la mujer se retirara para bajar al lugar donde yacía el cuerpo de su hijo y buscar ayuda. Lo encontró muerto. Declaró que “conocía a ‘Cana’ desde que ella era niña y vivía en Villa Cañona hasta que se mudó al caserío”. Cuando llegaron los agentes, les pidió que revivieran a su hijo, pero le indicaron que estaba muerto. Cuando uno de los policías le preguntó si sabía quién lo había hecho, él le contestó ‘Cana, Cana me lo mató’. (E.N.P. pág. 16.)
El testigo identificó en corte a la coacusada Ana Quiñones como la señora que se encontraba frente a su hijo cuando éste yacía tirado en el piso. (E.N.P. pág. 15.)
En el contrainterrogatorio, el señor Luis Ramos Rosario reiteró que escuchó dos detonaciones y que su hermano le informó que a su hijo le habían dado dos impactos de bala. También repitió que ‘Cana’ se echó un revólver en la cintura y llevaba otro en la mano, “que él la vio” aunque no lo dijera en la declaración jurada. Al confrontar la defensa su testimonio con la declaración jurada anteiior, el testigo leyó que había expresado en ese entonces “...y la otra metida por el lado derecho de su cintura”. Aseguró que vio lo indicado porque “era de noche, pero se veía claro, había bastante claridad”. (E.N.P. pág. 16.)
El testigo no recordó algunos datos sobre quién llegó a la escena del crimen primero o junto a él o con qué *1028 agentes habló y qué les dijo específicamente sobre el incidente. Afirmó que le manifestó a algún agente sobre quién le había matado a su hijo y que había dos armas, pero no recuerda a cuál de ellos fue que dio la información. (E.N.P. pág. 17.)
A preguntas del segundo abogado de defensa, relató que su hermano estaba en el balcón “sentado”, pero que desde el balcón “podía ver todo sin tener que virarse ni para la derecha ni a la izquierda”. Aunque no sabe quién hizo las detonaciones, recuerda que ‘Cana’ fue a su casa a preguntar por su hijo antes de las 8:00 de la noche. Quince minutos después escuchó los disparos. (E.N.P. pág. 18.)
En el redirecto, don Luis reiteró que fue su hermano quien le dijo “apea, apea que mataron a tu hijo”, refiriéndose a que su hijo estaba muerto tirado en el piso allí abajo. (E.N.P. pág. 18.)
El próximo testigo fue el Agente Joel Díaz Ortiz, adscrito al Precinto de Carolina para la fecha en cuestión. Declaró que llegó a la escena frente al edificio 4 y halló a una mujer, que luego identificó como Angélica, con un joven ensangrentado en su regazo. Éste tenía un orificio de bala en la parte de atrás de la cabeza y sangre en la frente y el tórax. Al lado izquierdo se encontraba el tío de la víctima, don Guillermo. Logró hablar con ambos familiares y los dos le manifestaron que vieron a la ‘Cana’ y al hijo, que “venían corriendo” al sobrino. Allí mismo, don Guillermo le expresó que “él estaba frente, en el balcón de él, que esto era donde ocurre el incidente e identificó el edificio como el número 7”. Indicó el agente que el número 4, frente al que cae la víctima, y el número 7 quedan frente a frente. (E.N.P. pág. 20.)
Luego de asegurar la escena, el testigo le informó al Agente Davis que el tío había presenciado el crimen, aunque no recordó su nombre. (E.N.P. pág. 20.)
En el contrainterrogatorio, el agente Díaz hizo referencia a unas libretas de notas en las que no aparecía anotada alguna de la información que dio en el directo ni otra información que don Guillermo y Angélica pudieron ofrecer. Por ejemplo, aunque en el directo afirmó que ambos le dijeron que vieron a ‘Cana’ y al hijo que “venían corriendo ” a la víctima, a preguntas de la defensa afirmó que no anotó tal cosa en la libreta. Tampoco anotó que oyeron detonaciones, que el sobrino cojeaba, que había dos armas, ni que le apuntaran en la cabeza. (E. N.P. págs. 21-22.)
El agente también declaró a preguntas de la defensa que no le dijo a nadie que tenían que abandonar la escena porque la víctima estaba muerta. Reiteró que el padre le indicó que el tío Guillermo fue quien vio cuando hicieron los disparos, que Angélica no vio disparar a los acusados aunque dijo que fueron la ‘Cana’ y el hijo. Él no volvió a interrogar a nadie sobre el caso porque pasó al CIC. (E.N.P. pág. 23.)
El Ministerio Público renunció al testimonio de varios testigos que puso a la disposición de la defensa, entre ellos, el patólogo forense Dr. Javier G. Serrano Serrano y el Agente Luis M. Davis Rivera, y dio por sometido su caso. La defensa presentó el testimonio de estos dos testigos como parte de su prueba.
El patólogo forense, Dr. Javier G. Serrano Serrano, testificó que la autopsia efectuada al cadáver de Luis Ramos Valdés demostró que recibió dos heridas de bala, una de ellas en la región frontal izquierda de la cabeza y otra en el lado derecho de la espalda al nivel lumbar. Hemos comparado el testimonio con el informe que obra en autos y las explicaciones que siguen toma en cuenta ambas pruebas, para mayor claridad del testimonio.
Las dos lesiones fueron heridas de entrada, es decir, sin salida, hechas a cierta distancia, desde dos o más pies de separación entre el cañón del arma y la herida. En su testimonio explicó que no fueron a quemarropa o corta distancia porque el cuerpo de la víctima no presentaba el tatuaje de pólvora o de humo o la impresión del cañón alrededor del orificio de entrada característico de este tipo de impacto de bala. Además, el agresor debió estar de pie cuando disparó. (E.N.P. pág. 25.)
*1029 El patólogo forense recuperó un proyectil deformado calibre .45 de la herida del lado izquierdo del tope de la región frontal de la cabeza, según surge de su informe. El proyectil causó una fractura en el lado izquierdo del cráneo, una perforación del lóbulo fronto-parietal izquierdo y occipital derecho del cerebro y un tracto hemorrágico diagonal que se extendió del hemisferio cerebral izquierdo al derecho. Sobre esta lesión, declaró que la trayectoria de la herida fue de adelante hacia atrás, de izquierda a derecha y de arriba hacia abajo. La víctima debió estar sentado o a un nivel más bajo que su agresor.
Según el informe pericial, se recuperó un proyectil calibre .38 de la herida ocasionada en la región lumbar. El perito explicó que el proyectil causó, entre otros daños, laceraciones al riñón derecho y al hígado y fracturó la primera vértebra lumbar de la columna vertebral de la víctima. Describió que la trayectoria de la herida fue de atrás hacia delante, de derecha a izquierda, y de abajo hacia arriba. Esta trayectoria indica que probablemente el individuo estaba boca abajo en el suelo al momento de recibir el disparo. Incluso indicó que esa trayectoria no era compatible con una persona que estuviera corriendo cuando recibió el impacto, afirmación que reiteró en varias ocasiones al recalcar que difícilmente estaría de pie. (E.N.P. págs. 24-25.)
No obstante, a preguntas del Ministerio Público y del Juez, como explicaremos más adelante, admitió que la víctima pudo recibir el primer disparo en la región lumbar, mientras estaba en un plano más bajo que su agresor, y luego correr por 10 o 15 minutos, tras lo cual pudo caer desangrado, momento en el que recibió el segundo disparo en la cabeza. (E.N.P. pág. 26.)
El Agente Luis M. Davis Delgado declaró que había trabajado como agente del CIC por seis años y llevaba diez años en la Policía de Puerto Rico para la fecha en que ocurrieron los hechos. Ese día llegó a la escena del crimen y le informaron que el tío de la víctima vio lo que pasó. Lo sacó de la escena para que no lo fueran a matar; así lo hizo. En el cuartel, y sobre lo que importa a este proceso, don Guillermo le contó que como a las 9:00 de la noche estaba sentado en el balcón de su casa y ve a la ‘Cana’ y a Jorge corriendo detrás de su sobrino y él se paró para bajar, pero que en eso se escuchan unos disparos y ve a su sobrino que cae al piso y se achoca con un tubo de un barandal y ahí baja. Luego de eso menciona que no vio ni a la ‘Cana’ ni a Jorge por todo aquello. No le habló de la conversación que sostuvo con ellos ni le expresó que los acusados hubieran corrido, apuntado o disparado a su sobrino. Tampoco le manifestó que su sobrino se aguantaba el costado mientras corría ni le describió las armas. (E.N.P., pág. 28.)
En el contrainterrogatorio del Ministerio Público expresó que la entrevista sólo duró 5 minutos, que don Guillermo estaba muy nervioso, que sólo quería volver a donde estaba su sobrino Luis y se fue a pie del cuartel sin que él pudiera retenerlo. Al volver a la escena del crimen, aunque don Guillermo estaba allí, no le habló más del asunto. (E.N.P., págs. 28-29.)
El último testigo de la defensa fue Felipe Sanjurjo Manso, quien era empleado del servicio postal y legislador Municipal del pueblo de Loíza. Declaró que conocía a Jorge y a su abuela y bisabuela, que el acusado nació y se crió en Loíza con sus abuelas, que siempre se mantuvo en la escuela con ánimos de superación y que cursaba estudios en el Liceo de Arte. Luego se enteró de que hacía la práctica en mecánica automotriz. Lo describió como un muchacho obediente. (E.N.P., pág. 29.)
En el contrainterrogatorio de la Fiscal, Sanjurjo Manso declaró que nunca residió en el Residencial San Patricio; que sabía que la madre de Jorge estuvo presa y por eso el joven vivía con su abuela; que no estaba al tanto del muchacho diariamente, aunque lo veía una o dos veces por semana; que Jorge es nieto de una hermana de su esposa; que tuvo conocimiento de que la Policía intervino con él, pero no conocía los detalles; que no sabía si Jorge estaba casado o si tenía hijos, ni conocía sus amistades; que entendía que el padre de Jorge ejercía sus funciones de padre, pero no podía precisarlo; y que tampoco sabía en qué edificio o apartamento del residencial vivió Jorge con su madre.
*1030 Con este testigo terminó el desfile de la prueba.
El Tribunal de Primera Instancia declaró culpable al señor Jorge Gautier Quiñones y lo condenó a cumplir la pena de reclusión de 99 años por el Artículo 106 del Código Penal del 2004 (asesinato en primer grado). Además, lo sentenció a cumplir consecutivamente dos penas de reclusión de 5 años por infringir el Artículo 5.04 (portación de armas de fuego sin licencia) y una pena de un año por infringir el Artículo 5.15 (disparar o apuntar un arma) ambos de la Ley de Armas.
II
A. Sobre la duda razonable, la apreciación de la credibilidad de los testigos y la suficiencia de la prueba. (Señalamientos de error A, B y C)
La Constitución del Estado Libre Asociado de Puerto Rico, en su Artículo II, Sección 11, consagra la presunción de inocencia como uno de los derechos fundamentales de todo acusado. El Tribunal Supremo de Puerto Rico ha reconocido que esta máxima constituye uno de los imperativos del debido proceso de ley. Pueblo v. León Martínez, 132 D.P.R 746, 764 (1993); Pueblo v. Irrizarry, 156 D.P.R. 780, 786 (2002).
El mandato constitucional determina, a su vez, el quántum de la prueba exigida en los casos criminales, ya que la presunción de inocencia sólo puede derrotarse con prueba que establezca la culpabilidad del acusado fuera de duda razonable. Todos los elementos del delito, así como la conexión del acusado con los hechos que se le imputan, tienen que demostrarse con este rigor probatorio. Pueblo v. Bigio Pastrana, 116 D.P.R. 748, 761 (1985). En atención a estos principios, la Regla 110 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 110, ordena que “en todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de duda razonable acerca de su culpabilidad, se le absolverá...'”.
Ahora bien, la duda razonable y fundada no es otra cosa que la insatisfacción que siente el juzgador de los hechos con la suficiencia de la prueba inculpatoria, lo que significa que la prueba de cargo tiene que producir certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. Pueblo v. Carrasquillo Carrasquillo, 102 D.P.R. 545, 552 (1974); Pueblo v. Cabán Torres, 117 D.P.R. 645, 652-653 (1986); Pueblo v. Rosario Reyes, 138 D.P.R. 591, 598 (1995).
Esto no significa que la culpabilidad del acusado tiene que establecerse con certeza matemática. Debe ser producto del raciocinio de todos los elementos de juicio presentes en el caso. Por ello, para justificar la absolución de un acusado, la duda razonable debe surgir de manera serena, justa e imparcial, luego de que el juzgador considere la totalidad de la evidencia presentada por el Ministerio Fiscal para demostrar la participación del acusado en los hechos delictivos que se le imputan. Véase a Pueblo v. Cruz Granados 116 D.P.R. 3, 21-22 (1984); Pueblo v. Bigio Pastrana, 116 D.P.R._, a la pág. 761; y Pueblo v. Cabán Torres, 117 D.P.R._, a la pág. 652.
Demás está decir que el Estado tiene la carga de presentar la prueba necesaria y pertinente para establecer la culpabilidad del acusado. Este a su vez no tiene obligación alguna de aportar prueba para defenderse y puede descansar plenamente en la presunción de inocencia que le asiste. Pueblo v. Rosaly Soto, 128 D.P.R. 729, 739 (1991); Pueblo v. Irrizarry, 156 D.P.R._, a la pág. 787.
Sin embargo, en apelación, la responsabilidad de demostrar que procede la intervención en el fallo o veredicto condenatorio emitido por el foro de primera instancia, porque no se ajusta a los criterios reseñados, recae siempre en el apelante. Pueblo v. Cabán, 117 D.P.R._, a la pág. 654.
Al tomar en consideración los elementos que utilizará el juzgador para dar por probado un hecho, hay que tener en cuenta que las Reglas de Evidencia formulan el principio de que un hecho se puede probar mediante *1031 evidencia directa o circunstancial. Según la Regla 10 (h), 32 L.P.R.A. Ap. IV, R. 10(h), “[s]e entiende por evidencia directa aquélla que prueba el hecho en controversia sin que medie inferencia o presunción alguna, y que de ser cierta, demuestra el hecho de modo concluyente. ” La misma regla define la evidencia indirecta o circunstancial como “aquélla que tiende a demostrar el hecho en controversia probando otro distinto, del cual —en unión a otros hechos ya establecidos — , puede razonablemente inferirse el hecho en controversia”. Es decir, la característica fundamental de la prueba circunstancial es que la evidencia presentada genera un proceso de inferencias, que unido a otra evidencia ya admitida o por admitirse o a un razonamiento basado en la experiencia, permiten concluir la probabilidad de la ocurrencia de un hecho. La expresión evidencia circunstancial, obedece a que se trata de que las circunstancias son las que apuntan en dirección favorable a la inferencia razonable del hecho en cuestión, no a una mera conjetura. Véase, Ernesto L. Chiesa, Tratado de Derecho Probatorio, Vol. II, Publicaciones JTS, 1998, a la pág. 1239.
En cuando a la prueba testifical, la Regla 10 (d) de Evidencia, 32 L.P.R.A. Ap. IV, R. 10(d), expresamente dispone que “[l]a evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que por ley otra cosa se disponga”. Véase Pueblo v. Ruiz Bosch, 127 D.P.R. 762, 788 (1991); y Pueblo v. Ortiz Martínez, 116 D.P.R. 139, 145 (1985). Por otro lado, la falta de veracidad de un testigo en cuanto a parte de su testimonio no implica que el juzgador deba descartar el resto de la declaración, sobre todo cuando lo declarado no es totalmente increíble o improbable. Pueblo v. Chévere Heredia, 139 D.P.R. 1, 20 (1995).
Por lo dicho, el Tribunal Supremo de Puerto Rico ha resuelto que la prueba o la evidencia circunstancial es intrínsecamente igual a la prueba o evidencia directa, y cualquiera de ellas, la directa o la circunstancial, debe ser suficiente en derecho para producir la certeza o convicción de la culpabilidad del acusado en un ánimo no prevenido. Pueblo v. Carrasquillo Carrasquillo, 102 D.P.R._, a la pág. 552.
Estas normas enmarcan el análisis de los primeros tres señalamientos de error.
-A-
Alega el apelante que el testimonio del único testigo ocular de los hechos, el señor Guillermo Ramos, es contradictorio a tal extremo que no puede ser sostenido por la prueba física recuperada en la escena del crimen. Específicamente alega que el señor Guillermo Ramos no pudo haber presenciado los hechos que declaró durante el juicio, ya que, según su testimonio, primero escuchó unas detonaciones y luego se asomó por el balcón. Por lo tanto, ya la víctima yacía en la rampa de impedidos cuando el testigo se asomó por el balcón, por lo que era imposible que viera al señor Gautier matar a Luis Ramos Valdés. Fundamenta sus alegaciones en que los agentes que investigaron la escena sólo encontraron dos casquillos de bala y que el padre de la víctima testificó haber escuchado solamente dos detonaciones en la noche de los hechos. Estos planteamientos son inmeritorios.
Los autos originales de instancia contienen todos los objetos recuperados en la escena que luego fueron presentados como evidencia ante el tribunal a quo. Estos incluyen, como mencionamos anteriormente:

“1. Un proyectil disparado y deformado calibre .38 recuperado en la escena aproximadamente a cuarenta y ocho (48) pies de distancia del cuerpo;

2. Blindaje de bala calibre .38 recuperado en la escena aproximadamente a veinte (20) pies de distancia del cuerpo;

3. Dos casquillos de bala calibre .45 recuperados en la escena aproximadamente a quince (15) y a ocho (8) pies de distancia del cuerpo, respectivamente;

*1032
4. Un proyectil disparado calibre .38 que fue recuperado de la herida en la espalda de la víctima; y

5. Un proyectil disparado y deformado calibre .45 que fue recuperado de la herida en la cabeza de la víctima. ”

El análisis de balística preparado por el Instituto de Ciencias Forenses- establece que el blindaje de bala calibre .38 y los dos proyectiles calibre .38 fueron disparados por el mismo revólver 357. El informe establece además que los dos casquillos de bala calibre .45 fueron disparados por la misma arma de fuego. La evidencia reseñada demuestra contundentemente que se utilizaron dos armas de fuego distintas para matar a la víctima y que los agresores dispararon las armas en el lugar en que fue ultimada la víctima en por lo menos cinco ocasiones. Esto concuerda con la declaración ofrecida por el señor Guillermo Ramos, quien declaró que escuchó varias detonaciones y luego presenció el último disparo que terminó con la vida de su sobrino.
La relación de los puntos del terreno en donde los agentes encontraron la evidencia física antes reseñada también es consistente con su testimonio. Más aún, las fotografías y el croquis que obran en autos confirman que el testigo se encontraba en un lugar yentajoso desde donde pudo presenciar fácilmente todos los detalles que luego declaró en el juicio.
El señor Gautier también alega que, según los hallazgos del patólogo forense, los disparos fueron a distancia y que tal conclusión científica es inconsistente con el testimonio del señor Guillermo Ramos. Arguye que su testimonio no concuerda con la evidencia forense porque se puede inferir de la declaración que el disparo hecho a la cabeza de la víctima fue de contacto, es decir, a menos de dos pies de distancia desde el cañón del arma hasta la herida. Entendemos que ese planteamiento también carece de méritos.
El señor Guillermo Ramos declaró que la víctima estaba en el suelo y sus agresores estaban de pie frente a él a unos dos pies de distancia del cuerpo. Además, las fotografías del lugar claramente muestran que la calle donde ocurrieron los hechos tiene una inclinación, por lo que el cuerpo de la víctima, especialmente su cabeza, quedaba a un nivel más bajo y alejado del punto donde se encontraban sus agresores. Aun cuando el testimonio del señor Guillermo Ramos especifica que Gautier extendió su brazo antes de disparar, pudo mantener una distancia de dos pies, apenas 24 pulgadas, o más, de distancia entre el cañón de su arma y la cabeza de la víctima.
Por otro lado, el señor Gautier nos plantea que el tribunal sentenciador erró al dar crédito al testimonio de Guillermo Ramos porque, según el apelante, fue completamente contradictorio e inverosímil. Pretende que sustituyamos el criterio del juzgador de los hechos por el nuestro porque el testigo ocular admitió que pudo olvidar algunos detalles debido a su tratamiento con metadona. Si bien es cierto que su testimonio mostró ciertas contradicciones, eso no le restó credibilidad a su declaración. Ésta fue corroborada por el testimonio ofrecido por el padre de la víctima y por la evidencia física y científica presentada por el Estado.
Por ejemplo, los testigos del Estado y los de la defensa coincidieron en que Guillermo fue quien vio lo sucedido desde una posición privilegiada, quien avisó al padre de la víctima e identificó a los agresores desde ese momento y quien compareció al cuartel a dar su versión de los hechos. La trayectoria de la víctima y sus agresores fue corroborada por el informe de hallazgos, y el modo como ocurrieron los hechos fue sostenido por el testimonio del perito forense.
En el contrainterrogatorio de la Fiscal, el Dr. Serrano reiteró que los daños corporales de la víctima confirman que ésta yacía cuando recibió el disparo en la región lumbar. No obstante, a las preguntas del juez sobre la causa de la desviación de la bala a la parte superior del cuerpo, el perito explicó lo siguiente, según se expresa en la exposición narrativa de la prueba:

*1033
“Indicó que lo más probable es que este individuo, al verse herido, salió corriendo, y pudo haber tropezado en algún lado y caer al piso. Entonces recibió el otro disparo. La herida de la espalda, aunque era de carácter mortal, no le iba producir la muerte de inmediato porque se produce por desangramiento. Hay unos daños que podrían ser letales y la muerte se produciría en unos 10 a 15 minutos. Esto da oportunidad de que estando herido se levante hasta que pierde su capacidad de moverse y puede haber quedado sentado en un área y recibir entonces el segundo disparo. ”

Exposición Narrativa de la Prueba, pág. 26.
Luego, en el redirecto de la defensa, según la exposición narrativa, el Dr. Serrano aclaró lo siguiente:

“Le fue preguntado si la teoría más correcta era que el individuo venía corriendo, cae al piso y recibe el impacto de bala. El testigo confirmó que él pensaría que sí. Le fue preguntado sobre las probabilidades de que recibiera el impacto, siguiera corriendo un término de tiempo y luego cayera. Contestó el testigo que es cierto, y que lo cierto es que cuando recibe el segundo impacto de bala, el individuo estaba en el piso de espaldas, y si recibe los dos disparos a la vez deforma inmediata, el individuo no se puede levantar a correr. ”

Exposición Narrativa de la Prueba, pág. 26.
La narración de don Guillermo en el juicio guarda entera armonía con el relato probable que hizo el perito. El sobrino corrió herido durante un trecho, por eso lo vio cojeando y agarrándose el costado, ya que sufrió daño interno; luego cayó tendido frente a la rampa de impedidos, donde fue ultimado por el apelante. Según el testigo, la coacusada registró el cuerpo de su sobrino como si buscara algo, lo que pudo provocar que quedara volteado hacia arriba como él lo describió, aunque efectivamente le dispararon mientras estaba boca abajo en el pavimento. La Policía no pudo corroborar este hecho porque, al llegar a la escena, Luis estaba en brazos de Angélica. El juzgador de los hechos tenía la obligación de aquilatar toda la prueba e inferir razonablemente lo que pasó. Concluyó que el apelante disparó a Luis y le provocó la muerte y esto lo hizo sin dudar de su culpabilidad.
Advertimos que los foros apelativos no debemos intervenir con la apreciación particular que hace el juzgador de los hechos sobre la credibilidad de un testigo. Sólo podemos intervenir con esa apreciación si el juzgador actuó con pasión, prejuicio o parcialidad, o si cometió un error manifiesto al aquilatarla. Véase, Meléndez v. Caribbean Int’l News, 151 D.P.R. 649, 664; Quiñones López v. Manzano Pozas, 141 D.P.R. 139, 152(1996).
El juzgador de los hechos tiene la oportunidad de escuchar y ver a los testigos mientras ofrécen sus declaraciones y es quien está en mejor posición para valorar toda la prueba aportada por ellos. Esta regla general de deferencia reconoce que los foros apelativos, de ordinario, “sólo tenemos r[é]cords... mudos e. inexpresivos”. Pérez Cruz v. Hospital La Concepción, 115 D.P.R. 721, 728 (1984).
No identificamos razón jurídica alguna ni datos en los autos originales que nos persuadan a intervenir cón la apreciación de la prueba efectuada por el tribunal a quo! No incidió el foro apelado al dar credibilidad al testimonio del testigo de cargo. Disponemos así del segundo y el tercer señalamiento de error.
-B-
Nos compete ahora analizar y decidir si la evidencia presentada por el Ministerio Público fue suficiente para probar más allá de duda razonable y fundada que el señor Gautier es culpable de.los delitos imputados, como se cuestiona en el primer señalamiento de error.
Atinente al caso de autos, el Tribunal Supremo ha decidido reiteradamente que los foros apelativos *1034 podemos evaluar si se cumplió el criterio probatorio ‘fuera de duda razonable’, porque es ésta una cuestión mixta de hecho y derecho. En ese ejercicio revisor, no podemos confirmar un fallo condenatorio si estamos convencidos de que “...un análisis integral de la prueba no establece la culpabilidad del acusado más allá de duda razonable. Nosotros, al igual que el foro recurrido, tenemos no sólo el derecho, sino el deber de tener la conciencia tranquila y libre de preocupación. ” Pueblo v. Irrizarry, 156 D.P.R. , a la pág. 790.
El Artículo 105 del Código Penal de 2004, 33 L.P.R.A. see. 4733, tipifica el delito de asesinato como la acción de dar muerte a un ser humano con intención de causársela. Tomando en consideración los distintos métodos e intención con las que un ser humano puede matar a otro, nuestro ordenamiento jurídico ha clasificado el delito de asesinato en dos grados. En lo pertinente, el Artículo 106 del Código Penal de 2004, 33 L.P.R.A. see. 4734, dispone que todo asesinato perpetrado con premeditación constituye asesinato en primer grado; toda otra muerte intencional de un ser humano constituye asesinato en segundo grado. La diferencia entre el asesinato en primer grado y el de segundo grado es ese elemento esencial de la intención calculada y deliberada que existe en el primero.
El Artículo 14(w) del Código Penal de 2004, 33 L.P.R.A. sec. 4642(bb), define la premeditación como la deliberación previa a la resolución de llevar a cabo el hecho luego de darle alguna consideración por un período de tiempo. Esta definición, a su vez, surge de las reiteradas decisiones del Tribunal Supremo en las que se ha resuelto que la deliberación es la resolución de matar después de darle alguna consideración a la idea o acción. Además, ha resuelto que cualquier período de tiempo, por corto que sea, es suficiente para reconocer la existencia del elemento de la deliberación. Véase, Pueblo v. Torres Montañez, 106 D.P.R. 125, 129, (1977). De igual forma, este foro ha sostenido que ese lapso puede ser tan rápido como el pensamiento. Véase, Pueblo v. Echevarría Rodríguez I, 128 D.P.R. 299, 368 (1991); Pueblo v. Rosario, 67 D.P.R. 371, 375 (1947). Asimismo, la deliberación necesaria para configurar el delito de asesinato en primer grado puede inferirse del uso de un arma, ya que tal uso puede implicar razonablemente una intención de matar o de causar daños cuya consecuencia probable sea la muerte. Pueblo v. Colón Soto, 109 D.P.R. 545, 548 (1980).
En síntesis, los elementos del delito de asesinato en primer grado que debió probar el Ministerio Público, son los siguientes: (1) dar muerte a un ser humano, (2) tener el ánimo o la intención específica de causar dicha muerte, y (3) que la intención de matar surja luego de alguna ponderación o consideración, sin importar el tiempo que tome la determinación final de delinquir.
En el caso de autos, el Ministerio Público probó todos los elementos del delito imputado al apelante. La evidencia presentada por el Estado y valorada y creída por el tribunal a quo demostró que el señor Gautier disparó su arma de fuego por lo menos dos veces en dirección a la víctima. Aun cuando pudo inferirse su intención de causar la muerte de Luis Ramos Valdés por el uso de un arma de fuego, el modo y las circunstancias en las que realizó el segundo disparo eran suficientes para probar su ánimo malicioso: la intención del señor Gautier cuando disparó a la cabeza de Luis Ramos Valdés era quitarle la vida y lo hizo cuando la víctima yacía en el piso herida de gravedad e indefensa.
El señor Gautier además fue sentenciado por infracciones a la Ley de Armas. El Artículo 5.04 de la Ley de Armas, 25 L.P.R.A. sec. 458c, establece que toda persona que transporte o porte cualquier arma de fuego, sin tener una licencia de armas o su correspondiente permiso para portar armas, incurrirá en delito grave. Según el estatuto que precede, el delito de portación ilegal de armas comprende dos elementos esenciales, a saber: (1) la persona acusada bajo este estatuto transportó o portó cualquier arma de fuego, y (2) esa persona no contaba con los permisos expedidos por el Estado para realizar tal acción.
El delito tipificado en el Artículo 5.04 de la ley especial no requiere el elemento subjetivo de una intención específica. Esto quiere decir que el Estado sólo tiene que probar que el acusado portaba un arma de fuego y que no contaba con los correspondientes permisos para así hacerlo.
*1035 La prueba, valorada y creída por el tribunal sentenciador, demostró que el señor Gautier utilizó y, por ende, portó un arma de fuego para extinguir la vida de Luis Ramos Valdés y que no contaba con los permisos expedidos por el Estado para portar o transportar arma de fuego alguna.
Por su parte, el Artículo 5.15 de la Ley de Armas, 25 L.P.R.A. sec. 458n, dispone que también incurrirá en delito grave toda persona que: (1) voluntariamente dispare cualquier arma en un sitio público o en cualquier otro sitio donde haya alguna persona que pueda sufrir daño, aunque no le cause daño a persona alguna, o (2) intencionalmente, aunque sin malicia, apunte hacia alguna persona con un arma, aunque no le cause daño a persona alguna. En este caso, el delito de disparar o apuntar un arma de fuego se divide en dos modalidades, que a su vez cuentan con sus propios elementos.
En primer lugar, una persona infringe el Artículo 5.15 si: (1) dispara cualquier arma en un lugar público o donde haya alguna persona que pueda sufrir daños, y (2) tal acción es voluntaria. La segunda modalidad se configura cuando el acusado: (1) apunta hacia alguna persona, aunque no le cause daño, y (2) tal acción es intencional, aunque no sea maliciosa.
La prueba presentada por el Ministerio Público y creída por el juzgador también demostró que el señor Gautier disparó el arma de fuego que portaba ilegalmente contra Luis Ramos Valdés en los predios del Residencial San Patricio y el agredido murió como resultado del disparo. La prueba demostró, además, que el señor Gautier persiguió a la víctima corriendo y disparó su arma contra ella por lo menos dos veces y que uno de los disparos fue dirigido a la cabeza mientras aquélla yacía en el piso. Esto claramente demuestra que las acciones del señor Gautier en la noche de los hechos fueron voluntarias, por lo que quedó configurado el delito tipificado en Artículo 5.15 de la Ley de Armas.
No incidió el foro apelado al apreciar toda la prueba presentada en el juicio y resolver que el Ministerio Público probó que el apelante incurrió en los hechos delictivos imputados fuera de duda razonable. Disponemos así del primer señalamiento de error.
B. Sobre la admisibilidad de prueba y el debido proceso de ley. (Señalamientos de error D y E)
Por lo dicho, el señor Gautier también alega que el foro apelado no le ofreció un juicio justo e imparcial por haber fundamentando su declaración de culpabilidad en el testimonio del señor Guillermo Ramos y excluir las grabaciones que su representación legal hizo de la Vista Preliminar para impugnar la declaración que hizo en el juicio.
Las Reglas 4 y 5 de Evidencia, 32 L.P.R.A. Ap. IV, R. 4 y 5, respectivamente, disponen que no se revocará sentencia alguna del Tribunal de Primera Instancia por motivo de la admisión o exclusión errónea de evidencia a menos que: (1) la parte interesada efectivamente haya objetado oportuna y correctamente dicha admisión o exclusión, y (2) que el tribunal apelativo o revisor considere que la referida admisión o exclusión fue un factor decisivo y sustancial en la sentencia apelada. Cuando la parte interesada en la revocación de una sentencia alega que el foro apelado erró al excluir evidencia admisible, debe realizar su objeción oportuna y correcta mediante una oferta de prueba.
El propósito de la oferta de prueba, a nivel de instancia, es obtener un récord completo de la evidencia que se trata de admitir en el juicio para luego, en el proceso apelativo, poder plantear como error la exclusión de esa prueba. Ante el foro apelativo, la oferta de prueba es imprescindible para determinar si la evidencia excluida hubiera justificado un resultado distinto del caso, de haber sido creída por el foro apelado. Véase, Pueblo v. López Rivera, 102 D.P.R. 359, 368 (1974).
Por otro lado, la Regla 19 de Evidencia, 32 L.P.R.A. Ap. IV, R. 19, le confiere amplia discreción a los tribunales de instancia para excluir evidencia pertinente cuando su valor probatorio sea de poca importancia con *1036 relación a la presentación innecesaria de prueba acumulativa. Esto significa que los litigantes no tienen el derecho absoluto de presentar toda la prueba que hayan descubierto sobre el mismo asunto y con el mismo fin. Dado que se le concede gran deferencia a los tribunales de instancia cuando ejercen sus facultades discrecionales, no debemos intervenir con ellas, salvo en casos de abuso de discreción. Véase, Pueblo v. Rivera Nazario, 141 D.P.R. 865, 893 (1996).
Antes de discutir los planteamientos del señor Gautier sobre la exclusión de alguna pmeba admisible, debemos señalar que no describe específicamente la evidencia que fue admitida o excluida incorrectamente por el tribunal sentenciador ni los datos o las razones por las que considera que tal actuación constituyó un error sustancial para su defensa. En todo caso, al evaluar la totalidad del expediente, surge que durante el contrainterrogatorio del señor Guillermo Ramos, la representación legal de Gautier trató de impugnar la credibilidad del testigo comparando el testimonio que ofreció en el juicio con sus declaraciones anteriores durante el procedimiento de Vista Preliminar e, incluso, en vistas anteriores del juicio en su fondo. Luego de preguntarle si recordaba sus declaraciones anteriores, el testigo le contestó en varias ocasiones que no recordaba lo que había declarado. Ante esa situación, la representación legal del señor Gautier intentó presentar en evidencia las grabaciones que el propio abogado había hecho de la Vista Preliminar. El tribunal a quo no permitió en aquel momento que éste presentara como evidencia esa grabación. Ahí terminó ese incidente. La defensa tenía las declaraciones anteriores del testigo e hizo referencia a ellas.
Un examen minucioso de la exposición narrativa de la prueba oral, estipulada por ambas partes, reveló que la representación legal del señor Gautier confrontó a Guillermo Ramos en el contrainterrogatorio con unas declaraciones juradas que el testigo prestó durante la investigación del crimen. Admitir en evidencia la aludida grabación para impugnar al testigo sólo hubiera sido prueba adicional sobre las alegadas incongruencias entre sus declaraciones en las distintas etapas del proceso. El propio apelante admite el carácter acumulativo de las grabaciones en su recurso de la siguiente manera:

“El Honorable Tribunal no permitió a la Defensa siquiera intentar la presentación de testimonio para autenticar la grabación de la Vista Preliminar, con la cual se impugnaría aún más la declaración del testigo. ”

(Énfasis en el original.)
Resolvemos que el Tribunal de Primera Instancia no abusó de su discreción al excluir las grabaciones de la Vista Preliminar, ya que le permitió a la defensa presentar otra evidencia para impugnar el testimonio de Guillermo Ramos. Además, concluimos que la exclusión de las grabaciones no tuvo un efecto determinante ni sustancial en la decisión del tribunal sentenciador. Como mencionamos anteriormente, el mero hecho de no permitir la presentación de las grabaciones no privó al señor Gautier de su derecho a impugnar al testigo con otra evidencia, como lo hizo. El error, si lo hubo, no fue sustancial.
Por otro lado, no existe constancia alguna en los autos originales de que éste haya realizado la requerida oferta de prueba al tribunal a quo. Esa omisión no nos permite evaluar con más profundidad la magnitud del error imputado. No cometió el foro sentenciador los dos errores imputados.
C. Sobre la prohibición de castigos crueles e inusitados. (Señalamiento de error F)
También alega el apelante que las sentencias impuestas por el tribunal a quo son crueles e inusitadas. Específicamente, argumenta que el tribunal a quo no tomó en consideración que el señor Gautier tenía diecisiete años de edad, entre otras cualidades positivas, al momento de sentenciarlo. Un análisis de las sentencia impuestas al apelante demuestra que fueron fijadas al tenor de los parámetros establecidos en el Código Penal de 2004 y en la Ley de Armas, según enmendada. Más aún, por las infracciones a los Artículos 5.04 y 5.15 de la Ley de Armas, el foro impuso al apelante la pena más baja posible. No hay duda de que el Tribunal de Primera *1037 Instancia consideró los atenuantes reclamados al momento de sentenciar al señor Gautier.
Por otro lado, la edad del apelante es factor de importancia al ubicarlo en el sistema correccional para lograr su rehabilitación y reintegración a la sociedad como un ente útil luego de cumplir su sentencia. En esta etapa del proceso es que cobra especial vigencia la garantía constitucional contra los castigos crueles e inusitados. Mientras el apelante sea ubicado y tratado en el sistema como joven adulto, se cumple con el mandato constitucional y estatutario, en atención a su juventud y potencial para una efectiva rehabilitación. La implantación de esta política pública y garantía fundamental corresponde en primera instancia a la Administración de Corrección, no al tribunal sentenciador. No erró el foro sentenciador al fijar la condena de conformidad con el esquema de penas vigente y mandatorio.
ni
Por los fundamentos expuestos, confirmamos las sentencias apeladas.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones